DYK, Circuit Judge,
dissenting.
In 2003, Congress enacted the counterclaim provision of the Hatch-Waxman Act in order to prevent manipulative practices by patent holders with respect to the Orange Book listings. These practices were designed to delay the onset of competition from generic drug manufacturers. See Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub.L. No. 108-173, § 1101(a)(2)(C), 117 Stat.2066, 2452 (codified at 21 U.S.C. § 355(j)(5)(C)(ii)) (“the counterclaim amendment”). In my view, the majority, in reversing the district court, now construes the statute contrary to its manifest purpose and allows the same manipulative practices to continue in the context of method patents. The amendment was designed to permit the courts to order cor *1369 rection of information published in the Orange Book, yet under the majority’s opinion, erroneous Orange Book method of use information cannot be corrected. I respectfully dissent.
I
In 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act, commonly known as the “Hatch-Waxman Act.” Pub.L. No. 98-417, 98 Stat. 1585 (1984) (codified at 21 U.S.C. § 355 and scattered sections of 35 U.S.C.). Under the Hatch-Waxman Act, Congress required the Food and Drug Administration (“FDA”) to maintain and publish a list of patents associated with approved drugs and methods of use. See id. § 102(a)(1). The FDA has implemented this provision by publishing this list in its publication, Approved Drug Products with Therapeutic Equivalence Evaluations (the “Orange Book”). See 21 C.F.R. § 314.53(c)(2)(i)(O).[1] The statute is complicated, but its operation in the present context is not.
A
Under the Food, Drug, and Cosmetic Act (“FDCA”), a drug manufacturer must secure approval from the FDA for the sale of any drug in interstate commerce. 21 U.S.C. § 355(a). To do so, the manufacturer files a New Drug Application (“NDA”) with the FDA to secure approval for a “new drug,” 21 U.S.C. § 355(b)(1), a term which encompasses a new use for an existing drug, see 21 C.F.R. § 310.3(h)(4). The application requires that the manufacturer specify the drug (or drugs) in question and the proposed method (or methods) of use. See 21 C.F.R. § 314.53(b)-(c). The drug cannot be sold until the FDA has approved the drug for the particular method of use, 21 U.S.C. § 355(a), (b)(1), and the method of use is required to appear on the label, 21 U.S.C. § 352(f); 21 C.F.R. pt. 201, id. § 314.125(b)(8). Section 355(b) also requires the NDA filer to list all patents “with respect to which a claim of patent infringement could reasonably be asserted” by patent number and expiration date with its NDA application, 21 U.S.C. § 355(b)(1), while section 355(c)(2) requires NDA applicants to provide the same information with respect to patents issuing after the NDA application was approved, id. § 355(c)(2). This information, referred to as “information submitted ... under subsection (b) or (c)” or “patent information,” is published in the Orange Book. Id. § 355(b)(1), (c)(2).
A generic manufacturer may piggyback on the safety and efficacy data the original drug manufacturer submitted in its NDA, and may seek approval for an identical method of use for its identical generic product by submitting an “Abbreviated New Drug Application,” or “ANDA.” See id. § 355(j). If a patent is listed in the Orange Book for a drug or method of use covered by the NDA, the generic is generally required to certify that the patent has expired or is invalid or will not be infringed by the sale or use of the drug for which the ANDA is submitted. Id. § 355(j)(2)(A)(vii). In what is called a “paragraph IV” certification regarding noninfringement and invalidity, approval is stayed pending the outcome of court litigation to determine infringement and validity.[2] Recognizing that some NDAs would *1370 cover both uses covered by a patent and uses not covered by a patent, Congress enacted “section viii,” which allows the ANDA applicant to limit its application to unpatented uses, and to secure approval for those unpatented uses. Id. § 355(j)(2)(A)(viii); H.R. Rep. No. 98-857 pt. 1, at 22 (1984), as reprinted in 1984 U.S.C.C.A.N. 2647, 2655.
Some NDA filers realized that they could block generic competition by making unwarranted claims to patent coverage, for example, by listing in the Orange Book a patent for a drug or method of use when in fact the patent was clearly inapplicable. The FDA repeatedly declined to police the Orange Book listings,[3] and before the enactment of the counterclaim provision in 2003, we held that the courts could not do so through declaratory judgments. See Mylan Pharms., Inc. v. Thompson, 268 F.3d 1323, 1332-33 (Fed.Cir.2001).
Congress responded by enacting the counterclaim amendment as part of the “Greater Access to Affordable Pharmaceuticals Act” (“Gregg-Schumer Bill”), enacted in 2003. S. 1225, 108th Cong. (2003). The counterclaim amendment provides:
(ii) Counterclaim to infringement action.—
(I) In general. — If an owner of the patent or the holder of the approved application under subsection (b) of this section for the drug that is claimed by the patent or a use of which is claimed by the patent brings a patent infringement action against the applicant, the applicant may assert a counterclaim seeking an order requiring the holder to correct or delete the patent information submitted by the holder under subsection (b) or (c) of this section on the ground that the patent does not claim either—
(aa) the drug for which the application was approved; or
(bb) an approved method of using the drug.
21 U.S.C. § 355(j)(5)(C)(ii) (emphases added). Thus, the amendment allows an ANDA applicant, who is defending against a patent infringement suit brought by the holder of the NDA, to assert a counterclaim to correct or delete the Orange Book “patent information submitted ... under subsection (b) or (c)” on the ground that the patent does not claim “the drug for which the application was approved” or “an approved method of using the drug.” We have not previously construed this provision. The majority now holds that the counterclaim provision is unavailable to correct erroneous method of use information in the Orange Book — on two separate grounds.
II
A
In my view, the majority has misconstrued the term “patent information sub *1371 mitted ... under subsection (b) or (c).” Id. § 355(j)(5)(C)(ii)(I). In the majority’s view, method of use information is not “patent information.” The majority construes the term as limited to the patent number and expiration date: “[T]he Act defined the term ‘patent information’ as ‘the patent number and the expiration date.’ ” Majority Op. at 1366. There is, in fact, no definition of “patent information” in the statute, and in reaching this construction, the majority ignores critical statutory language. The statute requires the NDA applicant to
file with the application the patent number and the expiration date of any patent which claims the drug for which the applicant submitted the application or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug.
21 U.S.C. § 355(b)(1) (emphases added). Thus, the statute requires the NDA applicant to list patents claiming a drug or method of use “with respect to which a claim of patent infringement could reasonably be asserted.” In other words, the statute on its face contemplates that the scope of the patent must be accurately described and that the patent must be related to the drug or method of use for which the NDA application is submitted.[4] The statute does not require the listing of patent numbers and expiration dates in the abstract. It contemplates the description of the scope of the patent and of the relationship between the patent and the drug or the method of use; the description of that scope and relationship is itself “patent information.” The statute requires that this information be published, stating that the Secretary “shall publish information submitted under the two preceding sentences.” Id.
Other provisions of the statute also contemplate that the ANDA filer will be able to understand the scope of the patent and to relate the patent information to the drug or drugs being claimed and the method or methods of use being claimed. See id. § 355(b)(1). Describing the scope of the patent and relating the listed patents to the drug or method of use is essential to the operation of the statute, as the basic idea of the patent listings in the Orange Book is to put ANDA applicants on notice regarding which listed drugs and methods of use may be copied and which drugs or method of use are patent protected, and to enable the ANDA filer to submit an appropriate certification as required by law. The statute requires an ANDA applicant to provide, as part of the application,
(vii) a certification, in the opinion of the applicant and to the best of his knowledge, with respect to each patent *1372 which claims the listed drug referred to in clause (i) or which claims a use for such listed drug for which the applicant is seeking approval under this subsection and for which information is required to be filed under subsection (b) or (c) of this section—
(I) that such patent information has not been filed,
(II) that such patent has expired,
(III) of the date on which such patent will expire, or
(IV) that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted....
Id. § 355(j)(2)(A)(vii) (emphases added). Similarly, the section viii certification provision also appears to contemplate that information submitted under subsection (b) or (c) will encompass information regarding the patented method of use. The statute directs the ANDA applicant to submit,
if with respect to the listed drug referred to in clause (i) information was filed under subsection (b) or (c) of this section for a method of use patent which does not claim a use for which the applicant is seeking approval under this subsection, a statement that the method of use patent does not claim such a use.
Id. § 355(j)(2)(A)(viii). The statute plainly contemplates that “patent information” will include information that describes the scope of the patent and that relates the patent to the drug or method of use.
B
Quite apart from the fact that the majority’s limiting interpretation is inconsistent with the statutory language and structure, the majority’s interpretation is in my view untenable for other reasons.
First, the majority agrees that the counterclaim amendment was designed to overrule our decision in Mylan. Majority Op. at 1365. In overruling Mylan, Congress viewed erroneous information as to the scope of the patent and its relationship to an approved drug or method of use as “patent information” that could be ordered corrected. The majority appears to suggest that the overruling of Mylan is limited to the precise facts of Mylan, namely, the situation in which correction of the error would require that the patent number be deleted entirely from the Orange Book. See id. The overruling would not apply to a situation in which other erroneous Orange Book information is involved, for example, where the patent is erroneously listed with respect to a particular drug or method of use, but is properly listed elsewhere in the Orange Book. This ignores the context of the Mylan decision.
The first thing to understand is that the majority’s description of the Orange Book likely bears no relationship to the actual document. The Orange Book is not a list of patents from which a particular patent could be excised. The Orange Book is a list of NDAs that associates particular patents with approved drugs or methods of use. Correction of an Orange Book listing does not strike a patent from a list, it strikes (or corrects) the listing that associates the patent with a particular NDA, approved drug, or method of use.
The problem in Mylan was that the Orange Book improperly described the scope of the patent and improperly related the patent to a drug and method of use not covered by the patent. In Mylan, Bristol-Myers Squibb (“Bristol”) owned U.S. Patent No. 4,182,763 (“the '763 patent”) directed to the treatment of anxiety through the administration of buspirone hydrochloride. 268 F.3d at 1327. The '763 patent was listed in the Orange Book in connection with that use but was about to expire. Id. Eleven hours before the patent’s expiration, Bristol delivered to the FDA copies of U.S. Patent No. 6,150,365 (the “'365 patent”), which included a single method *1373 claim directed to the treatment of anxiety using a “metabolite” of buspirone.[5] Id. at 1327-28. Bristol sought to have the '365 patent listed in the Orange Book as covering buspirone and a method of using buspirone. Id. at 1328. Mylan and other ANDA applicants challenged the listing of the '365 patent on the ground that it only covered a metabolite of buspirone, and a method of using a metabolite of buspirone to treat anxiety. Id. After the FDA refused to correct the listing, Mylan filed suit for a declaratory judgment that Bristol improperly listed the '365 patent in the Orange Book as covering buspirone and the use of buspirone, and a preliminary injunction requiring Bristol to delist the '365 patent. Id. Reversing the district court, we held that there was no declaratory relief available to correct an erroneous Orange Book listing. Id. at 1332-33.
Thus, in Mylan, the accused infringer challenged the accuracy of the listing associating the patent with the approved method of use. Congress acted to provide a counterclaim action to correct such errors. Congress’ concern with the proper listing of the patent in the Orange Book does not remotely suggest a myopic congressional focus on situations where the patent belonged nowhere in the Orange Book, as the majority suggests. Most significantly, viewing the overruling of Mylan as limited to complete delisting would be inconsistent with the explicit statutory language, which provides for correction of Orange Book information “on the ground that the patent does not claim ... the drug for which the application was approved.” 21 U.S.C. § 355(j)(5)(C)(ii)(I). The statute thus must allow correction of a misdescription of patent scope that includes a drug not covered by the patent and erroneous information about the relationship between the patent and the drug, even if the patent is properly listed elsewhere in the Orange Book. In other words the scope of the patent and its relationship to the drug must be “patent information.”
Moreover, if “patent information” includes information as to the scope of the patent with respect to the drug and the relationship between the patent number and the drug, it must also include Orange Book information describing the scope of a method of use patent and linking the method of use to the patent. There is no basis in the statutory language or statutory purpose for distinguishing between drug information and method of use information. Either both must be “patent information,” or neither must be patent information. In my view, all Orange Book information is “patent information.”
Second, at the time the counterclaim provision was enacted in 2003, the FDA had adopted the Patent Listing Rule,[6] making clear that the agency had adopted a broad interpretation of “patent information submitted ... under subsection (b) or (c).” That interpretation is entitled to Chevron deference even if the language of the statute is ambiguous, and not (as I urge) plainly contrary to the majority’s interpretation. See Chevron U.S.A. Inc. v. Natural Res. Def. Council, 467 U.S. 837, 843-44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). By the time of the counterclaim *1374 amendment in 2003, the FDA had adopted detailed requirements for the submission of “patent information” for both drugs and methods. The 2003 rule, published as a proposed rule in the Federal Register in late 2002[7] and finalized six months before the counterclaim amendment, includes a section entitled “Submission of patent information” on the requirements for the listing of a patent in the Orange Book. See 21 C.F.R. § 314.53. The report accompanying the regulatory revision makes clear that the FDA is defining what constitutes “patent information” for purposes of subsections (b) and (c).[8] Additionally, the report accompanying the Proposed Rule in 2002 confirms that the FDA’s authority for the 2003 rule arises from not only the FDA’s general authority to enforce the FDCA under 21 U.S.C. § 371, but also its authority to implement section 505 of the Hatch-Waxman Act, “including the patent listing and patent certification requirements” in section 505(b). See Proposed Rule, 67 Fed.Reg. at 65,457. The regulation itself provides that “patent information” includes 1) “[ijnformation on the drug substance (active ingredient) patent including ... [wjhether the patent claims the drug substance that is the active ingredient in the drug product described in the new drug application or supplement,” 2) “[ijnformation on the drug product (eomposition/formulation) patent including ... [wjhether the patent claims the drug product for which approval is being sought,”[9] and 3) “[ijnformation on each method-of-use patent including ... [wjhether the patent claims one or more methods of using the drug product for which approval is being sought and a description of each pending method of use or related indication and related patent claim of the patent being submitted.”[10]
*1375 The NDA applicant is thus not only-required to submit the patent number and the expiration date as part of its application, but is also required to describe the scope of the patent and relate the drug substance, drug product, or method of use in question to the particular patent. Furthermore, the regulation requires an NDA holder or applicant to complete FDA Form 3542, which requires the applicant to identify whether the submitted patent claims a “drug substance,” “drug product,” or “method of use,” and link such information to each patent for which information is being submitted. See J.A. 918-20. The information in this form provides the basis for the Orange Book listing. See 21 C.F.R. § 314.53(c)(2)(ii).
Congress was well aware of this regulatory interpretation of “patent information” when it enacted the counterclaim provision. As Senator Schumer, one of the original sponsors of the amendment, stated, “The bill provides a critical complement to the work the FDA has done in clarifying its regulations on patent listing, but it goes much further.” Legislative and Regulatory Responses to the FTC Study on Barriers to Entry in the Pharmaceutical Marketplace: Hearing Before the S. Comm, on the Judiciary, 108th Cong. 19 (2003) (emphasis added). Additionally, in several places in the legislative history the FDA regulation is cited approvingly. See 149 Cong. Rec. S8690 (daily ed. June 26, 2003) (statement of Sen. Hatch, then-chairman of the Senate Committee on the Judiciary); 149 Cong. Rec. S8197 (daily ed. June 19, 2003) (statement of Sen. Frist, then Senate Majority Leader).
Quite apart from Chevron, it is well established that where, as here, Congress was specifically aware of the agency’s interpretation of a statutory term at the time the statute was enacted, this is compelling evidence of legislative adoption of the agency’s interpretation. This principle has been recognized by the Supreme Court for decades, both in the context of reenactment of existing statutes where statutory terminology had been construed by the agency before the reenactment,[11] and in the context of new legislation utilizing terminology that the agency had previously construed.[12] Here, Congress utilized the FDA’s interpretation of “patent information” by enacting the Gregg-Schumer Bill with full awareness of the agency’s interpretation of the term, and the FDA’s interpretation is binding on us in construing the statute.
*1376 Third, the legislative history makes clear that Congress was concerned with correcting Orange Book information generally. The legislative history suggests a broad concern with preventing brand manufacturers from manipulating the patent listing system in the Orange Book in order to delay entry of generics into the market. See 149 Cong. Rec. 31,200 (2003) (statement of Sen. Schumer) (“The [new] provisions close loopholes in the law and end the abusive practices in the pharmaceutical industry which have kept lower-priced generics off the market and cost consumers billions of dollars.”).[13] The purpose of the statutory provision as reflected in the legislative history refers broadly to correction of Orange Book information, not just to correction of patent numbers and expiration dates. As Senator Schumer described it, “[T]he provisions enforce the patent listing requirements at the FDA by allowing a generic applicant, when it has been sued for patent infringement, to file a counterclaim to have the brand drug company delist the patent or comet the patent information in the FDA’s Orange Book.” 149 Cong. Rec. S15,746 (daily ed. Nov. 24, 2003) (emphases added).
Under the circumstances, it seems to me that we must interpret the phrase “patent information submitted ... under subsection (b) or (c)” to include Orange Book information that describes the scope of the patent and relates the patent number and expiration date to the drug or method of-use and, in particular, that “patent information” submitted under subsections (b) and (c) must be interpreted to include the patent information required by the 2003 regulation, including method of use information.
Ill
In my view, the majority also errs by interpreting “an approved method of using the drug” in 21 U.S.C. § 355(j)(5)(C)(ii)(I)(bb) to mean “any” approved method of use approved in the patentee’s NDA. The majority’s approach here is fundamentally inconsistent with the Supreme Court’s admonition, in a recent opinion by Justice Scalia, that “[u]ltimately context determines meaning,” Johnson v. United States, — U.S. -, 130 S.Ct. 1265, 1270, 176 L.Ed.2d 1 (2010), and the Court’s repeated instruction that “[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy,” U.S. Nat’l Bank of Or. v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 455, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) (quoting United States v. Heirs of Boisdoré, 49 U.S. (8 How.) 113, 122, 12 L.Ed. 1009 (1849)).
The evident purpose of the counterclaim provision is to allow for the correction of “patent information submitted ... under (b) or (c).” In other words, as discussed above, the provision is designed to provide for correction of erroneous Orange Book information submitted by the NDA applicant or holder, including information with respect to patent coverage of both drugs and methods of use. That purpose is reflected in the language of the statute, which allows an ANDA applicant defending against an infringement action to “as *1377 sert a counterclaim seeking an order requiring the [NDA] holder to correct or delete the patent information submitted by the holder under subsection (b) or (c) of this section on the ground that the patent does not claim either(aa) the drug for which the application was approved; or (bb) an approved method of using the drug.” 21 U.S.C. § 355(j)(5)(C)(ii)(I) (emphases added). In other words, if the submitted Orange Book information claims patent coverage for an approved drug not covered by the patent or a method of use not covered by the patent, that information may be corrected.
Thus, the reference to “an approved method of using the drug” in subsection (bb) must refer to information in the Orange Book concerning “an approved method of using the drug.” The majority’s error lies in focusing on the relationship between the patent and the NDA (which is not Orange Book information), rather than the relationship between the patent and the Orange Book listing. Under the majority’s view, no correction of erroneous Orange Book information is permitted so long as the patent covered any approved method of use covered by the NDA. The patent can be listed in the Orange Book as erroneously covering approved use A, despite the fact that the patent actually covers approved use B, and the counterclaim provision provides no mechanism for correction. This cannot be what Congress intended.[14]
Moreover, the statutory language referring to “an approved method of using the drug” obviously refers, once again, to the terminology used in the 2003 Patent Listing Rule. That regulation required that for “each method of use patent” the NDA applicant submit certain information, including “[w]hether the patent claims one or more approved methods of using the approved drug product and a description of each approved method of use or indication and related patent claim of the patent being submitted.” 21 C.F.R. § 314.53(c)(2)(ii)(P)(1) (emphasis added). In other words, the regulation requires the patentee to relate the patent to the approved method of use. Subsection (bb) is directly concerned with correction of the Orange Book patent information relating the patent to the approved method of use.
Once the overall operation of the statutory scheme is understood, the text is clear. Webster’s Third New International Dictionary describes “a” as being “used as a function word before a singular noun followed by a restrictive clause or other identifying modifier <a man who was here yesterday >.” Webster’s Third New International Dictionary 1 (2002) (emphasis added). This definition appears before the definition of “a” as “any.” See id. As the example illustrates, “an” in this case may be the function word before the singular noun (“approved method of using the drug”) conveying a particular identity through the use of a restrictive clause. The restrictive clause here is implicit — -“an approved method of using the drug” logically refers to an approved method of use listed by the NDA holder in the Orange Book, as associated with the listed patent. Thus, “an” refers to a particular method of using the drug, that is, the particular approved method listed by the NDA holder in the Orange Book. This is the only interpretation of the statutory language that yields a result that is not plainly at variance with the purpose of the legislation as *1378 a whole. See Nixon v. Mo. Mun. League, 541 U.S. 125, 138, 124 S.Ct. 1555, 158 L.Ed.2d 291 (2004) (citing United States v. Am. Trucking Ass’n, 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940)). “As in all cases of statutory construction, our task is to interpret the words of these statutes in light of the purposes Congress sought to serve.” Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 608, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979).
In short, the statute must be construed to read as follows:
(ii) Counterclaim to infringement action.—
(I) In general. — If an owner of the patent or the holder of the approved application under subsection (b) of this section for the drug that is claimed by the patent or a use of which is claimed by the patent brings a patent infringement action against the applicant, the applicant may assert a counterclaim seeking an order requiring the holder to correct or delete the patent information submitted by the holder under subsection (b) or (e) of this section on the ground that the patent does not claim either—
(aa) the [associated] drug for which the application was approved; or (bb) an [associated] approved method of using the drug.
An error in an Orange Book use code, which covers an unpatented method of use, is subject to correction under a proper reading of the counterclaim provision.
IV
The facts in this case well illustrate the true manipulation that the counterclaim provision was designed to avoid. Here Novo Nordisk (“Novo”) was originally the owner of the patent on the chemical composition of repaglinide, U.S. Patent No. RE37,035 (“the '035 patent”), which expired on March 14, 2009. See Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd., 656 F.Supp.2d 729, 730 (E.D.Mich.2009). Novo is also the owner of a patent covering the use of repaglinide in monotherapy to treat diabetes, U.S. Patent No. 5,312,-924 (“the '924 patent”), which expired in September of 2006. The expiration of these patents meant that Novo could not claim any patent protection for monotherapy use of PRANDIN. However, Novo acquired an additional patent in 2004 (the patent in suit) claiming 1) a chemical composition of repaglinide and metformin; and 2) a method for treating non-insulin dependent diabetes mellitus (NIDDM) comprising administering to a patient repaglinide in combination with metformin. See U.S. Patent No. 6,677,358 col.10 11.42-43, 48-51 (“the '358 patent”). The '358 patent is not set to expire until June 12, 2018.
Following issuance of the '358 patent on January 13, 2004, Novo submitted an FDA Form 3546, dated February 5, 2004, associated with NDA 020741 (for PRANDIN). Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd., 649 F.Supp.2d 661, 663 (E.D.Mich.2009). The use code narrative was limited to claiming a use of PRANDIN in combination therapy. It read: “U-546 — USE OP REPAGLINIDE IN COMBINATION WITH METFORMIN TO LOWER BLOOD GLUCOSE.” Id. at 664. Thus, the Orange Book entry in 2004 included the following:
APPL/PROD INGREDIENT NAME; PATENT PATENT/PED PATENT NUMBER TRADENAME NUMBER EXCL EXPIRES CODE(S)
020741 001 REPAGLINIDE; PRANDIN 6677358 JUN 12,2018 DS DP U546
020741 002 REPAGLINIDE; PRANDIN 6677358 JUN 12,2018 DS DP U546
020741 003 REPAGLINIDE; PRANDIN 6677358 JUN 12,2018 DS DP U546
*1379 See J.A. 1235.
Caraco Pharmaceutical Laboratories, Limited (“Caraco”) filed an ANDA seeking approval to market repaglinide for the treatment of diabetes in anticipation of the expiration of the '035 patent. Novo Nor-disk, 649 F.Supp.2d at 662. In June 2005, Novo sued Caraco, claiming that if Caraco marketed repaglinide, it would infringe. Complaint at 3, Novo Nordisk, 649 F.Supp.2d 661.[15] Novo did not claim that Caraco would infringe the '924 patent or the '035 patent; nor could Novo make such a claim since Caraco sought approval to market repaglinide only after both patents expired. Rather, Novo claimed that Caraco would induce infringement of the '358 patent, apparently because the Caraco label would suggest the use of repaglinide together with metformin.
Following the FDA’s suggestion, Caraco sought a section viii certification, making clear that it was not seeking approval to market the use of repaglinide in combination with metformin (by limiting its label to the monotherapy use).[16] Based on the existing U546 use code description for PRANDIN (limiting the description of the patent to combination therapy), the FDA permitted Caraco to move forward with its label carving out information pertaining to use of repaglinide in combination with metformin. See J.A. 625-43.
Several months later, Novo then broadened the use code for PRANDIN associated with the '358 patent, changing the use code to read: “U-968 — A METHOD FOR IMPROVING GLYCEMIC CONTROL IN ADULTS WITH TYPE 2 DIABETES MELLITUS.” Novo Nordisk, 649 F.Supp.2d at 664. The Orange Book listing for PRANDIN then included the following:
APPL/PROD NO PATENT NO PATENT PATENT EXPIRATION DATE CODES
REPAGLINIDE — PRANDIN
N020741 001 6677358 Jun 12, 2018 DS DP U-968
N020741 002 6677358 Jun 12, 2018 DS DP U-968
N020741 003 6677358 Jun 12, 2018 DS DP U-968
See U.S. Dep’t of Health & Human Servs., Approved Drug Products with Therapeutic Equivalence Evaluations add. A, at 157 (30th ed.2010). Since U-968 appeared to encompass the use of repaglinide in monotherapy to treat diabetes, the FDA reversed itself and rejected Caraco’s proposed labeling carve-out, requiring Caraco to include the information regarding the patented repaglinide-metformin combination therapy in its generic label.[17]
*1380 Novo acknowledges that monotherapeutic use of repaglinide is not covered by the '358 patent. See, e.g., Majority Op. at 1364 (“Novo and Caraco agree that the '358 patent claims only one of the three approved methods of using PRANDIN (i.e., repaglinide in combination with metformin).”). But the use code claims that the patent does cover the monotherapy use. In my view, this is precisely the type of situation that Congress intended the counterclaim provision to address.
The concurrence blames the FDA for Caraco’s predicament, adopting Novo’s disingenuous argument that the FDA, and not Novo, was responsible for the change in the use code. The concurrence accuses the FDA of “gummfing] up the works. By requiring a single broad indication for repaglinide as part of the approved labeling, FDA created a situation where Caraco can no longer assert that its proposed labeling does not infringe the '358 patent.” Concurring Op. at 1368. First, the FDA did not require a change in the use code. The FDA does not interpret patents or police the Orange Book listings, the very source of the problem that led to the counterclaim provision. The FDA role in administering the Orange Book is ministerial: it simply lists the patent information that it receives from brand manufacturers, expecting those parties to abide by the statutory and regulatory mandates. See Apotex, Inc. v. Thompson, 347 F.3d 1335, 1349 (Fed.Cir.2003) (upholding the FDA’s position that the FDA’s duties with respect to the Orange Book are ministerial and that the Hatch-Waxman Act does not require the FDA to police the Orange Book listings to ensure compliance with regulatory and statutory requirements).
Second, while the FDA did require a general change in oral diabetes drug labeling in November of 2007 that required a corresponding change in the PRANDIN label, there is absolutely nothing in the statute or regulations that required Novo to change the use code to track this new indication.[18] The FDA did not direct or request that Novo change its use code to reflect the new indication, nor was Novo required under FDA regulations to make such a change. Indeed, in response to questioning at oral argument, Novo admitted this. Oral Arg. at 1:40-1:46 (“ [The FDA directive of 2007] did not require [a change in the use code] ... ”).
However, Novo argues that the labeling change required by the FDA in the “Indication” part of the label made the use code change appropriate. Novo argues that FDA Form 3542 allows them to submit either the method of use or the indication for the use code. Appellant’s Br. 36 (“FDA’s guidance is expressly written in the alternative: An applicant may describe either the indication or the method of use.”). That is partially correct,[19] but the form also requires that the use code information refer to that portion of the label *1381 that relates to a patented use. See J.A. 919. An approved label, as in this case, may cover both patented uses and unpatented uses. Nothing in the FDA regulations or FDA Form 3542 suggests that the patentee may derive Orange Book use code information from that portion of the label referring to unpatented uses. Quite the contrary, the applicable regulations and FDA Form 3542 are clear that the patentee is required to utilize those portions of the label that refer to the patented use. See 21 C.F.R. § 314.53(e)(2)(ii)(P)(2) (requiring the NDA holder to identify “the specific section of the approved labeling for the drug product that corresponds to the method of use claimed by the patent submitted”); J.A. 919.
Here, the patentee did exactly what was expressly forbidden. For the proposed use code description submitted on the FDA Form 3542, Novo submitted the following: “A method for improving glycemic control in adults with type 2 diabetes mellitus.” J.A. 673. It thus utilized that portion of PRANDIN’s label that refers to the use of repaglinide standing alone to treat diabetes (an unpatented use), not to the use of repaglinide together with metformin (a patented use).[20] There is no justification for using a portion of the label referring to an unpatented use to describe a patented use.
The manipulative nature of Novo’s actions is confirmed not only by the lack of justification for the change, but also by the timing of the change (two years after the labeling change was initiated by the FDA and immediately after the FDA approved Caraco’s section viii carve-out), and by its own admission that preventing approval of Caraco’s ANDA was part of the motivation for changing the use code. At oral argument, Novo conceded that the decision to change the use code was in part “a response to the section viii ruling ... in December '08 from FDA.” Oral Arg. at 3:43-4:03.
V
Finally, the majority opinion suggests that the court’s restrictive interpretation of the counterclaim provision is not so bad because it does not leave Caraco without a remedy to correct the erroneous Orange Book listing. The majority is sanguine about the outcome, believing that forcing Caraco to defend the paragraph IV infringement suit will “facilitate!] efficient resolution of disputes concerning potential overlapping of protected and unprotected uses.” Majority Op. at 1365. In contrast, the concurrence doubts that there is a remedy in the infringement suit, and I agree. As the concurrence notes, “[b]y requiring a single broad indication for repaglinide as part of the approved labeling, FDA created a situation where Caraco can no longer assert that its proposed labeling does not infringe the '358 patent.” Concurring Op. at 1368. Indeed, Novo’s adoption of a broad use code for PRANDIN likely prevents Caraco from being able to disprove infringement in the paragraph IV lawsuit, because Caraco is now compelled to include information regarding the patented combination therapy in its label.
Nor would there be a remedy in a suit under the Administrative Procedure Act (“APA”). To be sure, we have held that an APA action could be brought to challenge FDA action in refusing to police use codes in the Orange Book, but at the same time we expressed no view as to whether such an action would succeed. See Andrx Pharms., Inc. v. Biovail Corp., 276 F.3d 1368, 1379 (Fed.Cir.2002). To succeed in such an action, the ANDA applicant would *1382 have to establish that the FDA’s refusal to police use codes was arbitrary and capricious, or contrary to the statute. 5 U.S.C. § 706(2)(A). We have subsequently held that the FDA is under no statutory obligation to determine the correctness of particular patent listings in the Orange Book, and that nothing in the Hatch-Waxman Act requires the FDA to screen Orange Book submissions by NDA applicants and refuse those that do not satisfy the statutory requirements for listing. See Apotex, 347 F.3d at 1349; see also aaiPharma Inc. v. Thompson, 296 F.3d 227, 238-40 (4th Cir.2002). Moreover, the very enactment of the counterclaim provision assumed that no alternative remedy was available to an ANDA applicant challenging an Orange Book listing. Today’s decision strikingly limits the counterclaim provision with the consequence that, in all likelihood, the ANDA applicant is left without any remedy to correct an erroneous Orange Book listing with respect to a method of use patent. This cannot be what Congress intended.
In summary, the majority’s crabbed view of the statute sanctions an unjustified manipulation of the Orange Book. In this suit, Caraco seeks to compel Novo to correct the use code for PRANDIN, and to reinstate the earlier U-546 use code describing the '358 patent as covering the “USE OF REPAGLINIDE IN COMBINATION WITH METFORMIN TO LOWER BLOOD GLUCOSE.” Under the correct construction of the counterclaim provision, the district court properly held that Caraco was entitled to an order reinstating the former U-546 use code. See Novo Nordisk, 656 F.Supp.2d 729.
In holding that the counterclaim provision is unavailable, the majority’s approach is notably inconsistent with the approach adopted by our sister circuit in another recent Hatch-Waxman Act case, Teva Pharmaceuticals USA Inc. v. Sebelius, 595 F.3d 1303 (D.C.Cir.2010). There the court construed another provision of the 2003 amendments concerning the NDA holder’s withdrawal of “patent information submitted under subsection (b) or (c).” 21 U.S.C. § 355(j)(5)(D)(i)(D(bb)(CC). The statute provided that if such information were “withdrawn by the holder of the application,” the period of exclusivity of the ANDA first filer would be forfeited. See id. The court held that only the withdrawal resulting from a successful counterclaim suit triggered a forfeiture and not a voluntary withdrawal. Teva, 595 F.3d at 1317. This was so because there was “not a single cogent reason why Congress might have permitted brand manufacturers to trigger subsection (CC) by withdrawing a challenged patent, outside the counterclaim scenario,” id. (emphasis in original), and because of the strong policy of the statute favoring the 180-day marketing exclusivity period. Id. at 1318. Here the majority reaches a result that is unsupported by any cogent reason for leaving an ANDA applicant without a remedy to correct an erroneous Orange Book listing with respect to a method of use patent, and is directly contrary to the congressional purpose. I respectfully dissent.

. See also Applications for FDA Approval to Market a New Drag: Patent Submission and Listing Requirements and Application of 30-Month Stays on Approval of Abbreviated New Drug Applications Certifying that a Patent Claiming a Drag Is Invalid or Will Not Be Infringed, 68 Fed.Reg. 36,676, 36,686 (June 18, 2003) (codified at 21 C.F.R. pt 314) (“Report and Order Accompanying the Patent Listing Rule”).

. Where the applicant makes this paragraph IV certification, the patentee has forty-five *1370 days to bring suit for infringement of the patent that is the subject of the generic manufacturer’s certification, and the approval of the ANDA is stayed for a period of thirty-months (or until the resolution of the infringement suit, whichever is shorter). See 21 U.S.C. § 355(j)(5)(B)(iii). The first ANDA applicant to make a paragraph IV certification benefits from a 180-day period of marketing exclusivity, id. § 355(j)(5)(B)(iii)(IV)(iv), a provision intended encourage generic manufacturers to undertake challenges to patents claimed to cover brand drugs. See Teva Pharms. USA, Inc. v. Sebelius, 595 F.3d 1303, 1318 (D.C.Cir.2010).

. The FDA has consistently held the position that its role in listing patents in the Orange Book is ''ministerial,” and that establishing an administrative process for reviewing patents, assessing patent challenges, and de-listing patents would involve patent law issues that are beyond its expertise and authority. See, e.g., Report and Order Accompanying the Patent Listing Rule, 68 Fed.Reg. at 36,683.

. Subsection (b) refers to patent information submitted with an NDA application; subsection (c) describes the requirements for the submission of patent information after an NDA has already been filed. The patent listing and publication requirements of 21 U.S.C. § 355(c)(2) parallel those in § 355(b)(1):
If the patent information described in subsection (b) of this section could not be filed with the submission of an application under subsection (b) of this section because the application was filed before the patent information was required under subsection (b) of this section or a patent was issued after the application was approved under such subsection, the holder of an approved application shall file with the Secretary the patent number and the expiration date of any patent which claims the drug for which the application was submitted or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug.... Upon the submission of patent information under this subsection, the Secretary shall publish it.

. A metabolite is "[a] product of intermediary metabolism.” McGraw-Hill Dictionary of Scientific and Technical Terms 1319 (6th ed.2003). We held in Hoechst-Roussel Pharms., Inc. v. Lehman, 109 F.3d 756, 759 (1997), that a patent claiming either the active ingredient of a drug or a method of using that ingredient does not also cover metabolites of that ingredient.

. The full title of the final rule was: "Applications for FDA Approval to Market a New Drug: Patent Submission and Listing Requirements and Application of 30-Month Stays on Approval of Abbreviated New Drug Applications Certifying that a Patent Claiming a Drug Is Invalid or Will Not Be Infringed,” 68 Fed.Reg. 36,676.

. See Applications for FDA Approval to Market a New Drug: Patent Listing Requirements and Application of 30-Month Stays on Approval of Abbreviated New Drug Applications Certifying that a Patent Claiming a Drug Is Invalid or Will Not Be Infringed, 67 Fed.Reg. 65,448 (Oct. 24, 2002) (“Proposed Rule”).

. The Report explains why it is promulgating the regulation, and in fact this is because of the existence of subsections (b) and (c):
To explain why we (FDA) issued the proposal, we first describe how Federal law requires NDA applicants to file patent information and how that patent information can affect the approval of ANDA and 505(b)(2) applications....
Section 505(b)(1) of the act (21 U.S.C. 355(b)(1)) requires all NDA applicants to file, as part of the NDA, "the patent number and the expiration date of any patent which claims the drug for which the applicant submitted the application or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug.” Section 505(c)(2) of the act (21 U.S.C. 355(c)(2)) imposes a similar patent submission obligation on holders of approved NDAs when the NDA holder could not have submitted the patent information with its application.
Under section 505(b)(1) of the act, we publish patent information after approval of an NDA application in our approved drug products list entitled "Approved Drug Products With Therapeutic Equivalence Evaluations.” This list is known popularly as the "Orange Book” because of its orange-colored cover. If patent information is submitted after NDA approval, section 505(c)(2) of the act directs us to publish the information upon its submission.
Report and Order Accompanying the Patent Listing Rule, 68 Fed.Reg. at 36676.

. A "drug product” is a "finished dosage form ... that contains a drug substance, generally, but not necessarily, in association with one or more other ingredients.” See 21 C.F.R. § 314.3. A "drug substance” is "an active ingredient that is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease or to affect the structure or any function of the human body.” Id.

. These listing requirements are described in 21 C.F.R. § 314.53(c)(2), while § 314.53(c)(1) provides: "An [NDA] applicant ... shall sub *1375 mit the required patent information described in paragraph (c)(2) of this section for each patent that meets the requirements described in paragraph (b) of this section.”

. See United States v. Bd. of Comm'rs of Sheffield, Ala., 435 U.S. 110, 131-35, 98 S.Ct. 965, 55 L.Ed.2d 148 (1978) (adopting the Attorney General's interpretation of "state[s] and political subdivision” to include all political units in a designated jurisdiction where Congress was aware of the Attorney General’s interpretation when it reenacted the Voting Rights Act without change in 1975); Cammarano v. United States, 358 U.S. 498, 510, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959) (adopting IRS’ construction of "ordinary and necessary” business expenses as excluding sums spent to persuade the public of the desirability of proposed legislation affecting the taxpayer's business, as Congress reenacted the Internal Revenue Code without substantive change to the business expense deduction); Hartley v. Comm’r, 295 U.S. 216, 220, 55 S.Ct. 756, 79 L.Ed. 1399 (1935) (adopting IRS' construction of "basis” for the purposes of a decedent’s estate to be the property’s value at the time of decedent’s death, as Congress reenacted the pertinent Internal Revenue Code provisions without substantive change).

. See Traynor v. Turnage, 485 U.S. 535, 546, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988) (adopting Veterans’ Administration’s construction of "willful misconduct” as including alcoholism, where Congress enacted GI Bill using the same "willful misconduct” language previously construed by the Veterans’ Administration).

. See also 149 Cong. Rec. at S8191 (daily ed. June 19, 2003) (statement of Sen. Schumer) ("A lot of blockbuster drugs were on the market. Their patents were about to expire. The drug industry ... came to the conclusion that they had to do everything they could, they had to pull out all the stops to extend their monopolies. They came up with wild and crazy schemes to do it, such as patenting the substance the body makes when the drug is ingested; developing computer programs and listing the patents on the drug; and, in one case, absurdly, a new patent was asked for because the color of the bottle was changed. That was never the concept of Hatch-Wax-man.’j.

. The majority suggests that Congress borrowed the statutory language from our decision in Mylan and that this shows that “an” means "any,” because in Mylan the patent did not relate to any approved use. Majority Op. at 1365. I have demonstrated above that Congress could not have intended to limit the counterclaim provision to the particular facts in Mylan.

. In particular, Novo asserted that marketing of repaglinide would infringe claim 4 of the '358 patent, which claimed:
A method for treating non-insulin dependent diabetes mellitus (NIDDM) comprising administering to a patient in need of such treatment repaglinide in combination with metformin.
'358 patent col. 10 11.48-51.

. Caraco initially made a paragraph IV certification with respect to Claim 4 of the '358 patent and a paragraph III certification with respect to the '035 patent on repaglinide. Opposition to Plaintiffs-Appellants' Emergency Motion to Stay Mandatory Injunction Pending Appeal at exh. 7, at 3, Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd., No.2010-1001 (Fed.Cir. Oct. 7, 2009). However, at the FDA's urging it sought a "split certification,” a paragraph IV certification as to the drug product claims of the '358 patent, and a section viii certification as to the method claim. See J.A. 635.

. With the exception of the carve-out to avoid the infringing use, the language of the generic label must otherwise match that of the original drug label. See 21 U.S.C. § 355(j)(2)(A)(v), (j)(4)(G); 21 C.F.R. *1380 § 314.94(a)(8)(iv). Thus, in this case, without the section viii carve-out, Caraco would be required to include information regarding the combination therapy included in PRANDIN’s label (in the “Dosage and Administration” and "Clinical Pharmacology” sections) in its own label. See J.A. 637. The inclusion of information regarding the combination therapy would likely cause Caraco to induce infringement of the '358 patent.

. In November of 2007, as part of an ongoing reevaluation of the professional labeling of all oral antidiabetic drugs, the FDA required Novo to replace all separate indications with the following sentence: “PRANDIN is indicated as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.” See J.A. 667-68.

. The form provides alternatives with respect to submission of a proposed use code— it directs the NDA holder to "provide the information on the indication or method of use for the Orange Book.” J.A. 920.

. Various other parts of the current PRANDIN label reference the combination therapy, such as the "Clinical Pharmacology” and "Dosage and Administration” sections of the label.